**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>LAUREN HANDY, *et al.*,<br>Defendants. | Criminal Action No. 22-096 (CKK) |

**OMNIBUS MEMORANDUM OPINION**
(November 16, 2023)

On October 22, 2020, a group of pro-life activists forced entry into a reproductive health clinic in the District of Columbia in order to halt, for as long as possible, abortions scheduled for that day. For their actions, the Government charged ten of these activists with, among other things, conspiracy against civil rights, in violation 18 U.S.C. § 241, and obstructing access to reproductive health services, in violation of 18 U.S.C. § 248.[1] Over the course of two trials, two juries of impartial Washingtonians have since convicted eight of the charged defendants on both counts. Now before the Court are Defendants' various post-trial motions. Upon review of the pleadings,[2]

[1] Defendants are: Lauren Handy, Jonathan Darnel, Jay Smith, Paula "Paulette" Harlow, John Hinshaw, Heather Idoni, William Goodman, Joan Bell, and Herb Geraghty.

[2] The Court's consideration has focused on:

- Defendant Idoni's Motion to Dismiss Count 1 Pursuant to Rule 29, ECF No. 415;
- Defendant Geraghty's Motion for Dismissal Pursuant to Fed. R. Crim. P. 29, ECF No. 452;
- Defendant Hinshaw's Supplemental Motion for Judgment of Acquittal, ECF No. 454;
- Defendants Handy, Hinshaw, Goodman, and Geraghty's Motion for Judgment of Acquittal, joined by Defendant Marshall, ECF No. 455;
- Defendant Goodman's Supplemental Motion for Dismissal Pursuant to Fed. R. Crim. P. 29, ECF No. 456; and
- The Government's Opposition [to] Defendants' Motions for Judgment of Acquittal, ECF No. 359.

In an exercise of its discretion, the Court has concluded that oral argument would not be helpful in the resolution of the pending motions.

the relevant legal authority, and the entire record, the Court shall **DENY** these motions.[3]

## I. BACKGROUND

Over the course of two trials, the Government presented video, documentary, and testimonial evidence demonstrating that each of the ten Defendants in this case successfully schemed to disrupt access to a reproductive health clinic in the District of Columbia on October 22, 2020. Defendant Handy orchestrated this conspiracy, directing her co-Defendants to undertake various preparations to blockade the clinic. 8/17/23 AM Trial Trans. at 38:17-21; 9/12/23 Trial Trans. at 68:17-25. For example, Defendants Marshall, Hinshaw, Bell, and Harlow used chains and rope to block the clinic's doors. Gov.'s Ex. 1011. For her part, Defendant Handy made an appointment at the clinic under a false name in order to ensure her entry and her co-conspirators' entry shortly thereafter. Defendant Smith's entry was particularly violent, causing a nurse to stumble backwards and injure her ankle. Gov.'s Ex. 1001. Defendant Handy then directed others to blockade the clinic's doors, keeping potential patients out. *Id.*

As to conspiracy, much of the Government's evidence centered on Handy's written communications with others and the trial testimony of Caroline Davis, an unindicted co-conspirator. The conspiracy to disrupt the clinic began with messages exchanged between the conspiracy's leaders, Defendants Lauren Handy and Jonathan Darnel. On September 11, 2020, Handy began planning an event with Darnel sponsored by one of her pro-life organizations, Mercy Missions, to discuss forthcoming "nonviolent direct action," i.e., "civil disobedience," also termed a "traditional rescue." *See* Gov.'s Ex. 5083. A "traditional rescue," Handy explained to

---

[3] Defendant Idoni's [415] Motion to Dismiss Count 1 Pursuant to Rule 29; Defendant Geraghty's [452] Motion for Dismissal Pursuant to Fed. R. Crim. P. 29; Defendant Hinshaw's [454] Supplemental Motion for Judgment of Acquittal; Defendants Handy, Hinshaw, Goodman, and Geraghty's [455] Motion for Judgment of Acquittal, joined by Defendant Marshall, and Defendant Goodman's [456] Supplemental Motion for Dismissal Pursuant to Fed. R. Crim. P. 29. Defendant Darnel moved for a judgment of acquittal only orally, on the record.

responding officers on the day of the incursion, entailed "blocking [the entrance to]" an "abortion facility" to "not allow people to go inside." Gov.'s Ex. 1009. Handy and Darnel then began promoting this event in various social-media groups broadly centered in the Washington, DC area. *See* Gov.'s Ex. 5083. Additionally, each reached out directly to individuals from across the United States. *See, e.g.*, Gov.'s Ex. 5066.

Handy also promoted the event with Geraghty's assistance. For instance, the two worked on draft press releases for the rescue. Gov.'s Ex. 4001A at 12-13. The record also shows that Handy arranged for housing for Idoni, Hinshaw, Bell, Harlow, Marshall, and Goodman. *Id.* at 14.

The initial rally point was the home of a local pastor. *See* 9/12/23 AM Trial Trans. at 43:4-9. As Caroline Davis, a cooperating coconspirator, explained, Darnel and Handy led the initial meeting to discuss the planned rescue, and Idoni, Smith, Geraghty, and Bell participated. *See* 8/16/23 PM Trial Trans. at 81:2-82:8; 9/12/23 AM Trial Trans. at 44-54. There, Handy and Darnel explained that there would be two groups: (1) less obstructive protestors outside to "counsel" women entering the building that housed the clinic, and (2) activists inside or directly outside the clinic who would disrupt the clinic's operations. *See* 8/16/23 PM Trial Trans. at 86:3-87:4; 9/12/23 AM Trial Trans. at 55:4-12. This latter group would engage in a "traditional rescue," which Davis understood to mean blocking the doors to "get the clinic shut down for the day" and prevent the termination of a pregnancy. 9/12/23 Trial Trans. at 35:9-12; *see* 8/16/23 PM Trial Trans. 64:19-21. Handy termed this planned rescue in another way: risking arrest. 8/16/23 PM Trial Trans. at 86:21-22. Handy and Darnel then asked attendees to raise their hands if they intended to risk arrest through, at the very least, "blocking the doors of the abortion clinic." *Id.* at 87:1-12.

Davis further testified that some co-conspirators advocated the additional use of locks and chains. 9/12/23 AM Trial Trans. at 63:22-64:2. The group planned other tactics, including "going

limp" during arrest and Handy's use of a fake appointment to gain entry. 8/16/23 PM Trial Trans. at 90:2-8; 9/12/23 AM Trial Trans. at 64:20-25. The purpose of the fake appointment was "[t]o get the door opened . . . and then they [the rescuers] would rush them [the employees]." 9/12/23 AM Trial Trans. 65:1-5; *see* 8/16/23 PM Trial Trans. at 89:7-11. That said, Davis understood that the conspirators would limit themselves to nonviolent means of obstruction, though there was some concern that Smith, a recent "convert," might resort to force. 8/16/23 PM Trial Trans. at 94:21-95:10; 9/12/23 AM Trial Trans. at 68:22-25.

The following morning, the charged defendants and other uncharged coconspirators met near the clinic to have one last discussion as to the planned blockade. Gov.'s Ex. 2015. As Davis explained, according to plan, the charged defendants and other uncharged coconspirators

> m[et] at a specific location near the clinic. And then there w[ere] last-minute go-throughs, reminders of what the plan was, before [Handy] went towards the []clinic and the rescuers kind of followed suit waiting for the door to open and everybody to take their position.

8/17/23 AM Trial Trans. at 38:17-21; 9/12/23 Trial Trans. at 68:17-25. They also coordinated who would be responsible for a blue bag containing the ropes and chains to be used during the blockade. 8/17/23 AM Trial Trans. at 39:20-25; 9/12/23 Trial Trans. at 68:18-22. After additional discussion and posing for a group photo, the group departed for the clinic to begin successfully obstructing the clinic's operations. *See* Gov.'s Ex. 3005; 8/17/23 AM Trial Trans. at 39:25-40:1.

Upon arriving at the building housing the clinic, the group split into three. First, Handy entered the building and went to the clinic's main entrance in an effort to gain entry using her fake appointment. *See* Gov.'s Ex. 1079A. Second, a group of the conspirators hid in an adjoining stairwell (used as a fire escape) to avoid detection, waiting for the clinic door to open so that they could rush in. *See* 8/23/23 AM Trial Trans. at 39-40; Gov.'s Ex. 1079A. Third, activists who did not intend to actively blockade the clinic and Darnel stood outside the building housing the clinic,

waiting for the blockade to begin. *See* Gov.'s Ex. 1017.

Shortly before 9:00 AM, the time the clinic was set to open, Handy attempted to enter using a fake appointment she made under the name "Hazel Jenkins." 8/16/23 Trial Trans. at 114. This ruse was less successful than planned, because the clinic manager, Ms. Smith, recognized Handy from a prior incursion into the clinic a year earlier. *See* 8/21/23 AM Trial Trans. at 53:5-14. Nevertheless, shortly after Handy lied to clinic staff, they opened the clinic door for patients with appointments. Gov.'s Ex. 1079A.

After the first two patients entered at approximately 9:05 AM, clinic staff attempted to shut the door on Handy and Smith. Gov.'s Ex. 1001. Smith fought against one nurse, shoving the door open and the nurse backwards, causing the nurse to severely sprain her ankle. *See id.* (scuffle); 8/21/23 AM Trial Trans. at 70:4-7 (sprain). A melee ensued, and the clinic manager rushed from the medical procedure area into the waiting room with a broom to attempt to erect a barrier separating the two patients from Handy, Smith, and their co-conspirators. Gov.'s Ex. 1001. The clinic manager was not successful. *Id.* Bell slipped through an opening, dragging Harlow with her while Smith fought with the nurse. *Id.* Video evidence demonstrates Geraghty, standing between Harlow and Marshall, "forcibly" pushing forward at the same time. 8/21/23 AM Trial Trans. at 70:4; Gov.'s Exs. 1001, 1079A; *see also* 8/16/23 AM Trial Trans. at 123 (employee testifying group was "shoving themselves through me"). Marshall pushed her way in as well, though a nurse successfully ejected Geraghty and Marshall moments later. Gov.'s Ex. 1079A. By that point, this portion of the group had successfully shoved their way into the clinic, and Goodman and Hinshaw walked in meeting far less resistance. Gov.'s Ex. 1079A.

After Marshall successfully entered the clinic, she, Harlow, and Bell began distributing the locks and chains. *Id.* After Bell affixed her own bike lock to her neck, Harlow quickly retrieved

chains from the bag and passed it to Marshall. *Id.* Marshall, Bell, and Harlow immediately began to tie the chain to the two respective bike locks while Handy ordered various co-conspirators to block certain doors. *Id.* As the group moved waiting-room chairs to block the main entrance to the medical procedure area, Harlow, Bell, and Marshall wrapped rope and chain around Smith and Hinshaw. *Id.* Once connected, and this group sat in a row of chairs to block the entrance to the medical procedure area. *Id.*; Gov.'s Ex. 1004.

Police responded quickly, and Officer Homere Whyte entered the clinic approximately fifteen minutes later. Gov.'s Ex. 1004. When Officer Whyte attempted to remove the chain connecting Harlow, Bell, Smith, and Hinshaw, Harlow and Marshall insisted that Officer Whyte would injure them if he tried. Gov.'s Ex. 1011. Harlow then tried a different tack, lecturing Officer Whyte that he "ha[s] a conscience" that should lead him to "let [the conspirators] stay" in the clinic to "save lives." Gov.'s Ex. 1137. At the same time, Ashley Jones, a patient seeking to terminate her pregnancy, pleaded with the group blocking the door to the medical-procedure area. Gov.'s Ex. 1011. Harlow and her co-conspirators would not let Ms. Jones through, Marshall shouting at Ms. Jones "welcome to the adult world!" *Id.*

Ms. Jones then tried the employee entrance in the hallway. Idoni, Goodman, and an uncharged conspirator blocked that door. Gov.'s Ex. 1011. When Officer Whyte directed them to move, Idoni responded, "we cannot," motioned to Ms. Jones, and demanded that Officer Whyte "look at Ms. Jones' baby [in utero]" that was "so full of life." *Id.* Because Ms. Jones could not enter the medical-procedure area through either door, she instead decided to jump through a small window that separated the waiting room from the billing area. Gov.'s Ex. 1004. Visibly angered, Marshall then moved from blocking the medical procedure door to sit directly in front of the small window. *Id.*

Meanwhile, Darnel narrated the unfolding blockade on a Facebook livestream. He began by explaining that, in the clinic, his coconspirators were conducting a "block and lock rescue" in which "ten pro-life people [including Harlow] [were] bonding together physically to prevent the murder of preborn babies." Gov.'s Ex. 1017. Darnel explained that Harlow and others were "intervening with their bodies" to engage in a blockade so disruptive that nothing like it had occurred "in over twenty-five years." *Id.* The purpose of this collective endeavor was "to prevent women from entering the clinic to murder their children." *Id.* The plan, however, was to "go down with the ship" when "police [began] to arrest people." *Id.* Darnel filmed the beginning of this process when he entered the clinic approximately twenty-five minutes after the blockade had begun. Gov.'s Ex. 1011.

In addition to Ms. Jones, video evidence demonstrated the group impeding a second patient, Shampy Holler, in accessing termination services that day. Ms. Holler attempted to enter the clinic through the public entrance (and further through the medical-procedure door), because the group blocking the doors along with Geraghty "[we]re not allow[ing] [her] to enter." 9/12/23 PM Trial Trans. at 18:5-8. After this unsuccessful effort to enter the clinic to receive her scheduled medical services, Ms. Holler collapsed to the floor in pain. Gov.'s Ex. 1079B. Marshall then exited the clinic for the hallway, and implored Ms. Holler to leave, insisting "don't do this, don't do this." 9/12/23 PM Trial Trans. at 20:18-19. When Ms. Holler attempted to stand up, Marshall "push[ed] [Ms. Holler] [back] down" to the floor. *Id.* at 21:9-10; Gov.'s Ex. 1079B.

When police began arresting the group, Marshall and Bell acted according to the plan discussed at the evening meeting and refused to cooperate. For instance, Marshall leaned over Hinshaw to prevent police from removing the rope and chain tied around him. Gov.'s Ex. 1126. For her part, Bell insisted that police take a saw to the bike lock she affixed around her neck, rather

than removing the bike lock herself. Gov's Ex. 1015. She also forced police to place her in a wheelchair, rather than walk out of the clinic. *Id.* The last to be removed, Harlow employed a similar tactic. *Id.* Ultimately, the group caused the clinic to cease operations for approximately two-and-a-half hours. *See id.*

## II. LEGAL STANDARD

Rule 29(a) of the Federal Rules of Criminal Procedure provides in pertinent part that "[a]fter the government closes its evidence or after the close of all the evidence, the court on defendant's motion must enter a judgment of acquittal on any offense for which the evidence is insufficient to sustain a conviction." "In ruling on a motion for a judgment of acquittal, the trial court must view the evidence in the light most favorable to the Government[,] giving full play to the right of the jury to determine credibility, weigh the evidence[,] and draw justifiable inferences of fact." *United States v. Treadwell*, 760 F.2d 337, 333 (D.C. Cir. 1985) (citation omitted). "This stringent standard contemplates that the ultimate decision of guilty or innocence should be left to the jury, and that it is the province of the jury to credit certain testimony and reject other testimony." *United States v. Khanu*, 675 F. Supp. 2d 55, 60 (D.D.C. 2009). "[A] judgment of acquittal is appropriate only when there is *no* evidence upon which a reasonable juror might fairly conclude guilty beyond a reasonable doubt." *United States v. Weisz*, 718 F.2d 413, 438 (D.C. Cir. 1983) (emphasis original).

## III. DISCUSSION

### A. Challenges Unrelated to the Sufficiency of the Evidence

Although Rule 29 concerns itself exclusively with the sufficiency of the evidence, *see United States v. Staten*, 581 F.2d 878, 882 (D.C. Cir. 1978), Defendants press a smattering of other arguments properly raised pretrial or in a motion for a new trial pursuant to Rule 33. As to the

former, Idoni argues that the Government "abuse[d] [its] discretion" to charge pursuant to 18 U.S.C. § 241. The Court already rejected that argument in a prior memorandum opinion. *See United States v. Harlow*, 2023 WL 4706123, at *3 (D.D.C. July 24, 2023). As the Court explained there, "[i]t is not unusual for a particular act to violate more than one criminal statute, and in such situations the Government may proceed under any statute that applies." *Id.* (cleaned up) (quoting *United States v. Grider*, 585 F. Supp. 3d 21, 32 (D.D.C. 2022)). As Idoni offers no reason to revisit that ruling, the Court need not and does not reconsider it.

As to the latter, unlike Rule 29, Rule 33 sweeps broadly to permit a new trial as, in the Court's discretion, the interests of justice permit. Fed. R. Crim. P. 33(a); *United States v. Wheeler*, 753 F.3d 200, 208 (D.C. Cir. 2014). Defendants having failed to move pursuant to Rule 33 at all, all such arguments are, at best, not properly before the Court. Nevertheless, the Court will exercise its discretion to briefly address them.

*First*, Idoni, Handy, Hinshaw, Goodman, Marshall, and Geraghty take issue with the Court's instruction on Count One. They argue that the Court incorrectly defined the clause "to injure, oppress, threaten, or intimidate" a person to include conduct that also "obstructs" or "hinders" the exercise of a right guaranteed by federal law. As the Court explained in its memorandum opinion on the subject, such a reading is compelled by Supreme Court precedent (admittedly somewhat dated). *See United States v. Handy*, 2023 WL 6199084, at *1 (D.D.C. Sept. 22, 2023) (quoting *United States v. Waddell*, 112 U.S. 76, 80 (1884)). Insofar as Defendants simply repeat the arguments raised on the record during trial, the Court will not revisit the issue.

*Second*, Idoni appears to argue that the Court impermissibly precluded her from testifying that the clinic "was known to neglect and allow babies to die who come out still alive." ECF No. 415 at 2. As a threshold matter, the Court *did* permit Idoni, like Handy, to testify that she

*subjectively believed* that the clinic was engaged in infanticide. *United States v. Handy*, 2023 WL 5348660, at *1 (D.D.C. Aug. 21, 2023). The Court did not permit testimony that attempted to establish that the clinic *in fact* performed so-called "live birth" abortions, because no evidence was proffered to permit the Court or the jury to so find, and because such testimony would have resulted in a minitrial on the clinic's irrelevant purported criminal liability. *See id.* at *2-3. After carefully and exhaustively addressing this evidentiary issue, the Court cannot now conclude that it abused its "wide discretion" in balancing the evidentiary value of so specious an allegation. *See United States v. Moore*, 732 F.2d 983, 992 (D.C. Cir. 1984) (explaining trial court's broad discretion in application of Federal Rules of Evidence 403 and 404(b)).

*Third*, it appears that Defendants argue that the Court should not have repeated its *in limine* ruling that Defendants' statements were admissible non-hearsay pursuant to Federal Rule of Evidence 801(d)(2)(E). As a general rule, the jury's hearing an *in limine* ruling is a far cry from *per se* prejudice mandating a new trial. *See, e.g.*, *United States v. Lance*, 853 F.2d 1177 (5th Cir. 1988); *United States v. Hester*, 140 F.3d 753, 758 (8th Cir. 1998). Particularly so where the jury is instructed that the ultimate question of whether such statements were made and their veracity is for the jury alone to decide. *See United States v. Tracy*, 12 F.3d 1186, 1200-01 (2d Cir. 1993).

The Court did precisely that here. The Court informed the jury that it found a conspiracy "only in the context of admitting the statements. [You] [t]he jury will make their own decision about whether there is a conspiracy." 8/23/23 PM Trial Trans. at 125. In the final jury instructions, conveyed to the jury orally and in writing, the Court instructed the jury, among other things, that: (1) they were "the sole judges of the facts" and "alone decide" "what weight, if any" to give evidence admitted at trial; (2) they "must" "ignore" any "indicat[ion] [of] how [the Court] think[s] [they] should decide the case;" and (3) the jury's use of "any statements admitted [pursuant to

Federal Rules of Evidence 801 and 802]" is "limit[ed]" by the whole of the Court's instructions. ECF No. 445 at 4, 5, 20. Because the jury is presumed to follow the Court's instructions, *United States v. McGill*, 815 F.3d 846, 895 (D.C. Cir. 2016), Defendants cannot establish that its *in limine* ruling in open court so prejudiced the jury as to require a new trial (much less a judgment of acquittal).

*Fourth* and finally, Idoni protests that the Court should have held an evidentiary hearing on her proposed "defense of third persons" instruction. The Court also addressed this issue extensively. As the Court explained in prior orders, it does not appear that either of the charged statutes incorporate such an affirmative defense. Order, ECF No. 353 at 2 (Aug. 7, 2023); Minute Order (Aug. 14, 2023); Order, ECF No. 369 at 2 (Aug 21, 2023). This is so because federal criminal law is a creature of statute, and there is no indication that Congress would have *sub silentio* incorporated such a defense into charged statutes where the defense is predicated on the precise mental state the statutes require: purposeful and intentional interference with access to and provision of, among other things, abortion services. ECF No. 369 at 2; *see Dixon v. United States*, 548 U.S. 1, 12-13 & n.6 (2006). Even if such a defense were incorporated into the charged statutes *sub silentio*, it would fail on the proffered facts, for: (1) a fetus is not a person under federal law, 18 U.S.C. §§ 1841(a)(2)(A), 1841(c); and (2) the affirmative defense is unavailable for those who "don a vigilante's hood" to create the circumstances leading to their criminal use of force, ECF No. 353 at 2. Therefore, the Court (for the fifth time) rejects Idoni's meritless effort to secure a defense-of-third-person instruction.

**B. Sufficiency of the Evidence**

Turning to the issue properly before the Court, Defendants face a particularly high burden, for the Court must give the jury an even "high[er] degree of deference . . . when reviewing a

conviction of conspiracy." *See United States v. Landesman*, 17 F.4th 298, 320 (2d Cir. 2021) (cleaned up). Upon review of the entire record, including video evidence in which individual Defendants confess in clear terms their intent, motive, and conduct, the evidence is more than sufficient to support each of the jury's findings as to each Defendant.

1. Conspiracy Against Rights

To find a defendant guilty of conspiring against rights, in violation of 18 U.S.C. § 241, the Government must show that the defendant: (1) joined a conspiracy (2) to "injure, oppress, threaten, or intimidate any person" in the "free exercise or enjoyment" of a right or privilege guaranteed by "the laws of the United States." *See* 18 U.S.C. § 241; *United States v. Price*, 383 U.S. 787, 801-02 (1966). As the Court has already held, 18 U.S.C. § 248 provides a predicate right to provide or receive reproductive health services permitted by law, including abortions, without obstruction by a private person. *United States v. Handy*, Crim. A. No. 22-096 (CKK), 2023 WL 4744057, at *3 (D.D.C. July 25, 2023). Additionally, as noted above, the clause "injure, oppress, threaten, or intimidate" encompasses any conduct that is "intended to harm, frighten, punish, prevent, or obstruct a person's exercise or enjoyment" of a right guaranteed by federal law. *See United States v. Handy*, Crim A. No. 22-096, 2023 WL 6199084, at *2 (D.D.C. Sept. 22, 2023).

The Government presented ample evidence of conspiracy. Davis testified that each of the Defendants joined a conspiracy to obstruct access to, and the provision of, abortion services at the clinic on October 22, 2020. *Supra* at 3-4. Because it is for the jury to credit or discredit witnesses as the jury sees fit, Davis' testimony is the beginning and end of the matter. *See United States v. Reffitt*, 602 F. Supp. 3d 85, 92 (D.D.C. 2022). Even had Davis not taken the stand, the evidence would still be sufficient based on the video- and photographic record. The record clearly shows Handy directing all Defendants but Darnel in the clinic waiting room to take certain obstructive

actions, and Darnel contemporaneously commended his coconspirator's efforts to physically obstruct access to the clinic. *Supra* at 7. Because a jury may infer an agreement to undertake unlawful action "from conduct [alone]," *see, e.g.*, *United States v. Hegwood*, 977 F.2d 492, 497 (9th Cir. 1992), the evidence is more than sufficient to show that Defendants collectively agreed in advance of their entry into the clinic to "harm, frighten, punish, prevent, or obstruct a person's exercise or enjoyment" of their statutory right to receive and/or provide reproductive health services permitted by law.

2. Obstruction and Force

To find a defendant guilty of obstructing access to a reproductive health clinic, the Government must show beyond a reasonable doubt that: (1) the defendant used force or physical obstruction; (2) the defendant intentionally injured, intimidated, or interfered with a patient or employees of the reproductive health clinic in their receipt or provision of reproductive health services; and (3) the defendant did so because a patient was receiving or an employee was providing such services. 18 U.S.C. § 248(a)(1); *Terry v. Reno*, 101 F.3d 1412, 1414 (D.C. Cir. 1996).

But for Darnel, Defendants do not seriously contest sufficiency of the evidence as to obstruction, nor could they—police body-camera and surveillance video clearly demonstrate their obstruction of the clinic's services, and Davis' testimony and their own statements demonstrate the requisite motivation. Force, however, presents at least a colorable question. Surveillance video shows only Marshall, Harlow, and Smith placing their hands on clinic employees. *Supra* at 5. Darnel was outside at the time of the violent entry, and the rest were simply in the scrum. *Supra* at 5-6. Nevertheless, the evidence is sufficient to support the jury's finding of force under *Pinkerton v. United States*, 328 U.S. 640 (1946).

That case sets forth in federal criminal law the concept of "co-conspirator" liability, which makes a conspirator liable as a principal for his co-conspirators' unlawful conduct where that conduct "was reasonably foreseeable as a necessary or natural consequence of the unlawful agreement." *United States v. Ballestas*, 795 F.3d 138, 146 (D.C. Cir. 2015) (internal quotation marks omitted). In the second trial, Davis explained that the purpose of Handy's fake appointment was "[t]o get the door opened . . . and then they [the rescuers] would *rush* them [the employees]." 9/12/23 AM Trial Trans. 65:1-5 (emphasis added). The jury in the first trial could have inferred the same. Although the evidence may be more ambiguous as to the discussion between the conspirators the morning of the clinic invasion, the jury could have reasonably inferred from Handy's prior trespass at the clinic and the narrow entryway into the clinic that Handy explained (and the conspirators agreed) that force would be necessary to enter the clinic. That most of the conspirators hid in a nearby fire escape in order to pounce right as the clinic employees opened their main door is further evidence of some agreement to use force to enter the clinic. Because such an inference is reasonable, the Court cannot conclude that the evidence is insufficient on *Pinkerton* liability. *See United States v. Long*, 905 F.2d 1572, 1576 (D.C. Cir. 1990) (Thomas, J.) ("A jury is entitled to draw a vast range of reasonable inferences from evidence[.]"). And, because *Pinkerton* liability extends to all members of the conspiracy, including Darnel, the evidence was sufficient to conclude that all Defendants were principally or vicariously liable of using force to obstruct access to and provision of abortion services at the clinic.

## IV. CONCLUSION

Therefore, and for the foregoing reasons, the Court shall **DENY** Defendant Idoni's [415] Motion to Dismiss Count 1 Pursuant to Rule 29; Defendant Geraghty's [452] Motion for Dismissal Pursuant to Fed. R. Crim. P. 29; Defendant Hinshaw's [454] Supplemental Motion for Judgment

of Acquittal; Defendants Handy, Hinshaw, Goodman, and Geraghty's [455] Motion for Judgment of Acquittal, joined by Defendant Marshall, and Defendant Goodman's [456] Supplemental Motion for Dismissal Pursuant to Fed. R. Crim. P. 29; Defendant Darnel's oral motion for judgment of acquittal, and Defendant Bell's *pro se* oral motion for judgment of acquittal.  A separate order accompanies this memorandum opinion.

Dated: November 16, 2023                    /s/
                                            COLLEEN KOLLAR-KOTELLY
                                            United States District Judge