**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| v. | : | **CRIMINAL NO. 22-CR-96 (CKK)** |
| | : | |
| **JEAN MARSHALL,** | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America hereby submits this memorandum in support of its sentencing recommendation for Defendant Jean Marshall ("Marshall").

**I.      Introduction**

Marshall traveled with her sister from Massachusetts to Washington, D.C. with one goal: prevent women from accessing reproductive health care.  To accomplish that goal, on October 22, 2020, Marshall and her co-defendants invaded the Washington Surgi-clinic ("Surgi-clinic" or "clinic") and used force and physical obstructions to interfere with access to the clinic.  During this blockade, Marshall pushed and shoved a clinic worker to gain access to the clinic waiting room, helped her co-defendants use chains and locks to bind themselves to one another and to prolong the group's efforts to obstruct access to the clinic. Marshall also rearranged furniture, blocked the clinic's entrances, repeatedly yelled at one of the patients, and pushed one patient down to the ground to prevent her from accessing the care she needed. Marshall was convicted by a jury of civil rights conspiracy and Freedom of Access to Clinic Entrances (FACE) Act offenses for her role in planning and executing the clinic blockade.

1

To address the gravity of her federal offenses and further the goals of the criminal justice system, the government recommends that the Court sentence Marshall to a term of incarceration at the high-end of Marshall's recommended Sentencing Guidelines, which is 33-41 months at combined adjusted offense level 20 and criminal history category I.

## II.      Procedural Posture

On October 14, 2022, the grand jury returned a two-count superseding indictment, charging Marshall and her co-defendants with violating 18 U.S.C. § 241 (conspiracy against rights) and 18 U.S.C. § 248(a)(1) (FACE Act).   ECF No. 113.   These charges stemmed from Marshall's participation in a scheme to obstruct access to the Surgi-clinic - a women's reproductive health clinic - located in the District of Columbia, and her participation in the blockade of that facility on October 22, 2020.   After a jury trial, on September 15, 2023, Marshall was found guilty of both charges.   *See* Minute Entry, Sept. 15, 2023.   The jury also determined that Marshall had violated the FACE Act by both force and physical obstruction.   *Id.*

## III.     Overview of the Crimes

During trial, the Government presented the testimony of several witnesses and admitted approximately sixty exhibits into evidence.  This evidence proved that the co-defendants collectively invaded the Washington Surgi-clinic ("Surgi-clinic" or "clinic") to block, for as long as possible, access to reproductive health care, and in doing so, injured one of the clinic's nurses and inflicted significant trauma on patients.

The evidence proved that the blockade of the clinic was planned and organized by individuals local to Washington, D.C., including co-defendants Lauren Handy ("Handy") and Jonathan Darnel ("Darnel").   Handy and Darnel advertised a call-to-action on social media, and

invited participants to join the planned blockade. *See, e.g.*, Exhibit Nos. 5066, 5082-83. Their co-defendants, along with other unindicted co-conspirators, traveled from out-of-state to participate in the October 22, 2020, Surgi-clinic blockade.

The co-defendants communicated about the planned blockade between October 7, 2020, and October 22, 2020, using social media, text messaging, phone calls, and in-person meetings. *See, e.g.*, Exhibit Nos. 3005, 4001A, 5066, 5070, 5072, 5083, 5091, 7361, 7362; 10/25/23 Trial Tr. at 158:5-12,159:3-163:2. The co-defendants communicated that the purpose of the planned Surgi-clinic blockade was to stop the clinic from providing, and patients from obtaining, reproductive health services. *Id.* In planning the blockade, Handy also scheduled a fake patient appointment at the clinic for October 22, 2020, under the name "Hazel Jenkins," to gain access to the clinic facility. *See, e.g.*, Exhibit No. 5053; 10/23/23 Trial Tr. at 83:6-11.

Handy also made lodging arrangements for the blockade participants who traveled to Washington, D.C. from other states, including co-defendants: Jay Smith ("Smith"), John Hinshaw ("Hinshaw"), and William Goodman ("Goodman") from New York; Heather Idoni ("Idoni") from Michigan; Joan Bell ("Bell") from New Jersey; and Paula "Paulette" Harlow ("Harlow") and Marshall from Massachusetts. *See, e.g.*, Exhibit Nos. 4001A, 5002, 5091. Additionally, Handy procured monetary donations to pay for an Airbnb lodging reservation at 133 Quincy Place NE, Washington D.C. that she made for herself and co-defendant Geraghty who traveled to Washington, D.C. from Pennsylvania on October 21, 2020, to participate in the Surgi-clinic blockade. *See, e.g.*, Exhibit Nos. 4001A, 5001, 5002, 5021, 5091.

The night before the planned clinic blockade, the ten co-defendants – led by Handy and Darnel – discussed the plan for and execution of the blockade. *See, e.g.*, 10/24/23 Trial Tr. at

3

22:11-23:24.  At the meeting, Handy and Darnel further discussed the Surgi-clinic's layout and floor plan so that each blockade participant knew which clinic doors to blockade.  *Id.*, at 25:21-24. The group further discussed using locks and chains to block the Surgi-clinic doors, and the consequences of participating in the blockade, which included being arrested by the police and charged with criminal offenses.  *Id.*, at 25:21-24, 28:25-29:25.

On October 22, 2020, the group met again outside a coffee shop near the clinic to have one last discussion as to the planned blockade.  *See e.g.*, 10/25/23 Trial Tr. at 107:1-5 (suggesting meeting place was outside a "coffee house" or "restaurant"); *see also* Exhibit Nos. 2015, 2017. Co-defendant Joan Bell brought to this final meetup a bag containing the chains, locks, and ropes. *Id.*, at 27:23-24.  After additional discussion, the group departed for the clinic to begin successfully obstructing the clinic's operations.  *See, e.g.*, 10/24/23 Trial Tr. at 63:18-21.

The co-defendants and other unindicted co-conspirators arrived at the Surgi-clinic shortly before it was scheduled to open the morning of October 22, 2020.  While several co-defendants hid in the Surgi-clinic's fourth floor building stairwell, Handy and Bell waited outside of the clinic's patient entrance.  *See, e.g.*, 10/25/23 Trial Tr. at 122:6-11; Exhibit No. 1079A.  Handy approached "Sasha Proctor," a medical specialist working at the clinic, in the hallway outside of the clinic and falsely represented herself as "Hazel Jenkins" and stated that she had a medical appointment.   Moments later, Darnel's co-defendants who hid in the building's stairwell approached the Surgi-clinic's patient entrance.  *See, e.g.*, Exhibit Nos. 1008, 1079A.

Goodman carried the bag of chains, locks, and ropes from the stairwell and placed it on the floor just outside of the Surgi-clinic's patient entrance.  *Id.*  Bell retrieved a bicycle lock from that bag and forcefully entered the clinic.  *Id.*  Harlow picked the bag up and forcefully entered the

clinic behind Bell.  Harlow wore a bicycle lock around her neck in anticipation of using it to chain herself to Bell and other co-defendants as they blocked the Surgi-clinic's doors.  *See, e.g.*, Exhibit Nos. 1016, 1079A.

Moments before the Surgi-clinic was scheduled to open at 9:00 a.m., as the co-defendants gathered outside of the Surgi-clinic's patient entrance, Darnel – who was outside of the clinic's building - announced an imminent reproductive health clinic blockade on social media and prepared to livestream the event.  *See, e.g.*, Exhibit Nos. 1017-20, 1022-1024, 1026.  Darnel used one of his Facebook accounts to create an event he titled, "No one dies today," and captioned it, "Starting soon!  Tune in!"  *See, e.g.*, Exhibit No. 3001.

At approximately 9:00 a.m., Ms. Proctor unlocked the door to admit the waiting patients with scheduled appointments.  At that time, the co-defendants (with the exception of Darnel who was outside of the building livestreaming the event) forcefully entered through the Surgi-clinic's entrance.  *See, e.g.*, Exhibit Nos. 1008, 1079A.  Co-defendant Smith, who stood at the door when it was unlocked, forcefully pushed the door open as Ms. Proctor attempted to close the door to prevent the co-defendants from entering.  *Id.*  The co-defendants collectively pushed and shoved their way in and against the clinic staff who attempted to keep the co-defendants from entering. *Id.*

As co-defendant Smith forced his way into the clinic, he pushed clinic nurse "Sara Compton" causing her to sprain her ankle and suffer bodily injury.  *See e.g.*, Exhibit No. 1001; 10/23/23 Trial. Tr. at 45:23-25. Co-defendants Marshall and Geraghty pushed and shoved against Ms. Proctor.  And, as Harlow intentionally pushed her way into the clinic, she caused "Tina Smith," the clinic's administrator, to fall backwards and into a chair.  *See, e.g.*, Exhibit No. 1008.

After forcing their way into the clinic's waiting room, the co-defendants set about physically blockading the Surgi-clinic doors. *See e.g.*, Exhibit No. 1001. Handy directed the blockaders on what to do. *Id*. Hinshaw and Marshall moved chairs in the Surgi-clinic's waiting room to block doors that led to the clinic's treatment areas. *Id*. Harlow, who entered the clinic with the bag of locks, chains, and rope, worked with Smith, Hinshaw, and Bell to intentionally bind themselves together using the chains, ropes and bicycle locks, and they sat in chairs against the Surgi-clinic's interior doors. *Id*. Marshall assisted Harlow, Smith, Hinshaw, and Bell with using the locks and chains to bind themselves together. *Id*. Goodman and Idoni went into the hallway outside of the Surgi-clinic and stood in front of another clinic doorway that was used as an employee entrance. *See, e.g.*, Exhibit Nos. 1008, 1016, 1020, 1079B.

During the blockade, "Ashley Jones," a patient at the clinic, was unable to access the treatment area because co-defendants Bell, Harlow, Smith, Hinshaw, and Marshall blocked the clinic's doors. *See, e.g.*, Exhibit Nos. 1008, 1016. Ms. Jones was forced to climb onto a chair and through a receptionist window in the waiting room to access the Surgi-clinic's treatment area, which was where the clinic staff remained during the co-defendants' blockade. *Id.*

A second patient, "Shampy Holler," was also unable to access the clinic's treatment area because of the co-defendants' blockade. *See, e.g.*, 9/12/23 Trial. Tr. at 14:22-25. Mrs. Holler, who was experiencing labor pains and in need of immediate medical attention, was forced to lay on the hallway floor outside of the clinic because the co-defendants refused to allow her and her husband to enter. *Id.*, at 15:1-2. At one point as Mrs. Holler lay on the ground, she was accosted by Marshall. *See, e.g.*, Exhibit No. 1079B. As Mrs. Holler attempted to get up from the floor, Marshall pushed Mrs. Holler back down to the floor in order to prevent her from entering into the

facility.  *Id.*; *see also* 9/12/23 Trial. Tr. at 21:7-9.  After a short time, the clinic staff managed to

open the staff entrance briefly and were able to get Mrs. Holler into the clinic.  *Id.*, at 21:16-19.

Throughout the entire blockade, Darnel livestreamed the event on social media.  *See, e.g.*,

Exhibit Nos. 1017-1019, 1022-1024, 1026.   Additionally, he assisted his co-defendants in

prolonging the blockade by secreting the keys to the bicycle locks used to bind several blockading

co-defendants together to an unindicted co-conspirator who was outside of the clinic building.  *See*

Exhibit No. 1024.  Darnel did this in order to delay the blockading co-defendants' inevitable arrests

by responding Metropolitan Police Department ("MPD") officers.

The co-defendants remained within the Surgi-Clinic's waiting room for several hours

blocking the doors in an effort to interfere with the provision of abortion services.  They refused

to move or leave the clinic when asked by the clinic's staff and responding police officers.  *See,*

*e.g.*, Exhibit No. 1016.  The co-defendants were very vocal about their blockade, and their reasons

for preventing access to the Surgi-clinic.  For example, Handy explained to the first responding

MPD officers, "[the co-defendants] were doing a rescue . . . . On the fourth floor is an abortion

facility and so today [the co-defendants] are blocking it . . . to not allow people to go inside . . . .

[t]o stop abortions today."  *See* Exhibit No. 1009.  Similarly, while sitting in a chair blocking

access to the clinic's treatment area, Harlow explained to one MPD officer, "We can't move. We

have permanent locks."  *Id*.  Harlow then further lectured that same officer, telling him that he

"ha[s] a conscience" that should lead him to "let [the co-conspirators] stay" in the clinic to "save

lives."  *See* Exhibit No. 1137.

After refusing the requests to move or leave the Surgi-clinic, the defendants were advised

that they would be arrested.  With the exception of Darnel and Geraghty – who left the clinic

moments before arrests were made, the remaining defendants were arrested. They passively resisted arrest by going limp, including when the police cut the bicycle locks that Bell and Harlow wore around their necks and placed them under arrest. *See, e.g.*, Exhibit No. 1016. The arrested defendants were carried out of the building and into transport vehicles.

In short, the testimony and exhibits presented proved that the defendants refused to move or leave the clinic because it was their intention to interfere with the Surgi-clinic's patients from obtaining, and the clinic staff from providing, pregnancy termination services. The defendants' participation in the planned blockade interfered with Ms. Jones, Mrs. Holler, and other patients from accessing the Surgi-clinic, and further interfered with the clinic staff's ability to provide reproductive health services.

## IV.    Marshall's Criminal Conduct

The evidence at trial proved that Marshall was an active participant in the conspiracy and blockade at the Surgi-clinic. Marshall chose to drive with her sister and co-defendant, Harlow, from her home in Massachusetts to Washington, D.C., stopping along the way to pick up defendants Bell and Goodman, to participate in the blockade.[1] Once in Washington, D.C., Marshall attended the pre-invasion meeting, 10/24/2024 Trial Tr. at 28-29, where she listened to Handy and Darnel discuss the plan—including who planned to risk arrest, the consequences of the FACE Act, and the tactics the invaders could use to delay arrest. *See id*. at 21-32.

Marshall met her co-defendants at a location near the clinic the morning of the blockade.

---

[1]    Although Marshall conveniently claimed to not remember who else was in the car with her and Harlow, Bell was able to confirm she traveled in Harlow's car to Washington, D.C. with Harlow, Marshall, and Goodman. *Compare* 10/25/23 Trial Tr. at 236-37 *with* 10/26/23 Trial Tr. at 20-21, 105-06.

After a final meeting to walk-through the plan, discuss the clinic's layout, and how the blockaders would enter the facility, Marshall walked with the other blockading co-defendants to the Surgi-clinic, where she hid in the stairwell until the clinic opened, 09/14/23 a.m. Trial Tr. at 17:8-13, buying time for Handy and co-defendant Bell to pose as a clinic patient ("Hazel Jenkins") and companion.

When the clinic door opened for the first scheduled appointments, which included Handy's fake "Hazel Jenkins" appointment, Marshall and her co-defendants forced entry into the facility. Refusing to be denied entry, Marshall pushed and shoved her way into the waiting room, causing a clinic worker to fall backwards into a chair. *See* Exhibit No. 1001 at 21:06:00-06:10. Once in the waiting area, Marshall did not waste any time. She helped rearrange the waiting room furniture to block access to the clinic treatment area, lock Bell and Harlow together with chains, and tie Hinshaw to a chair in front of the treatment area door. *See id.* at 21:07:00-13:10.

When Ms. Jones entered the waiting area, Marshall decided to confront her aggressively. Ignoring Ms. Jones' pleas for Marshall to leave her along, Marshall stood inches away from Ms. Jones as she repeatedly told her to "postpone your appointment." *See id.* at 9:25:00-95:10. After Marshall and her co-defendants forced Ms. Jones to climb through the reception area window to access the health care she needed, Marshall made sure no other patient would be able to do so by moving a chair in front of the window and sitting in that chair to block access. *See* Exhibit No. 1004 at 21:32:00-33:08.

Marshall also refused to follow law enforcement's requests to leave the clinic, explaining to Officer Homere Whyte, for example, that her co-defendants were all chained together and could not move because of the locks around their necks. *See id.* at 09:25:25-25:55. When Mrs. Holler

arrived, Marshall ignored her obvious pain. Instead of encouraging her co-defendants to allow

Mrs. Holler to access the health care she needed, Marshall stood over Mrs. Holler as she slumped

to the floor in pain and pushed her down as she tried to get up. *See* Exhibit No. 1079B. Ms.

Marshall further delayed access to the clinic by repeatedly refusing to cooperate with law

enforcement and delayed her arrest using tactics discussed the night before at the meeting. *See*

Exhibit No. 1016 at 11:02:18-11:04:05. Ms. Marshall was in the clinic waiting area for

approximately two hours—her actions were methodical, deliberate, and harmed clinic staff and

patients seeking the health care they needed.

## V.     Marshall's Trial Testimony

Marshall was one of five Defendants who chose to testify.  Although Marshall did not

testify in her own defense, following her conviction, she testified as a defense witness for her sister

and co-defendant Harlow at her bench trial before this Court.

Regarding the conspiracy, Marshall testified that she traveled to Washington, D.C. to

participate in a rescue. 10/25/23 Trial Tr. at 238:19. Her testimony, while under oath, that she was

unsure whether she was participating in a blockade and risking arrest is undermined by the record.

Almost a week before the planned blockade, Bell told Handy that she, Goodman, and two other

people—Marshall and Harlow—"want[ed] to risk arrest[.]" *See* Exhibit No. 5083. The evidence

is clear that Marshall discussed the blockade with Harlow and Bell, and the three of them

collectively decided to join the blockade by traveling to D.C. together, and that they would use

locks and chains to block the clinic's entrance.  *See* ECF No. 474 at 3.

Marshall's testimony concerning the blockade was "utterly belied by video evidence." *Id.*,

at 8.  Even when Marshall was confronted with video evidence depicting her moving chairs to

block access to the clinic entrances, Marshall claimed to not remember doing so. *Id.* at 8. Marshall also refused to identify co-defendant Handy, who the video evidence depicted standing just a few feet away from her in the clinic waiting rooms. *Id.* Similarly, Marshall refused to identify herself as the one pushing and shoving a clinic staff member, even when confronted with indisputable video evidence to the contrary. *See* 10/25/23 Trial Tr. at 271:19-272:22.

This Court found that Marshall "lied on the stand," and that her "self-serving testimony" was incredible.  ECF No. 474 at 8.

## VI.    Statutory Penalties

The two counts, for which Marshall and her co-defendants were convicted, carry the following statutory penalties:

Count 1:  Conspiracy against Rights, in violation of 18 U.S.C. § 241, carries a maximum sentence of 10 years' incarceration;

Count 2:  Clinic Access Obstruction, in violation of 18 U.S.C. § 248(a)(1) & (b), carries a maximum sentence of 12 month's incarceration.

## VII.    Sentencing Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."  *United States v. Gall*, 552 U.S. 38, 45 (2007); *Rosales-Mireles v. United States*, 585 U.S. 129, 133 (2018) ("[D]istrict courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process.") (internal quotations and citations omitted).  "[T]he Guidelines remain the foundation of federal sentencing decisions.  *Hughes v. United States*, 584 U.S. 675, 685 (2018).  "As a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence.  *Id.* at 49.  The

Sentencing Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Id.* at 46.

The government agrees with the Sentencing Guidelines calculation set forth in the Presentence Investigation Report ("PSR"). ECF No. 521. Marshall's Base Offense Level for both of her counts of conviction is 12. PSR at 14-15. And her Base Offense Level is adjusted as follows:

| Guideline | Description | Adjustments |
|---|---|---|
| § 2H1.1(a)(2) | Where the offense involved two or more participants | 12 |
| § 3A1.1(b)(1) | Vulnerable victim[2] | 2 |
| § 3A1.3 | Restraint of victim[3] | 2 |
| § 3C1.1 | Obstructing or impeding the administration of justice[4] | 2 |
| § 3D1.4 | Combined offense level for two equally serious groups | 2 |
| **Combined Adjusted Offense Level** | | **20** |

*See id.* Marshall has no criminal history, which places her in Criminal History Category I. *See* PSR at 15, ¶ 102. Accordingly, Marshall's Guidelines sentencing range is 33-41 months.

---

[2]  This adjustment is applicable because Ms. Jones and Ms. Holler were pregnant and unusually vulnerable due to their physical condition. *See, e.g.*, *United States v. James*, 139 F.3d 709, 714-15 (9th Cir. 1998) (Affirming the trial court's application of the vulnerable victim adjustment where the defendant threatened a pregnant bank teller during the commission of a bank robbery).

[3]  "Physically restrained" means the forcible restraint of the victim *such as* being tied, bound, or locked up. U.S.S.G. §1B1.1 (Application note 1(K)) (emphasis added). The use in the definition of "such as" indicates that the terms are merely illustrative examples and do not limit the type of conduct that may constitute a physical restraint. *Arcoren v. United States*, 929 F.2d 1235, 1246 (8th Cir. 1991) (Restraint of victim adjustment applied in case where the victims were pushed into a room and prevented from leaving); *see also United States v. Stokley*, 881 F.2d 114, 116 (4th Cir. 1989) (same).

[4]  This upward adjustment is appropriate because Marshall committed perjury at trial.

**VIII.   Section 3553(a) Sentencing Factors**

The Court should next consider the sentencing factors set forth in 18 U.S.C. § 3553(a). *Gall*, 552 U.S. at 49-50.  That Section provides that Court consider the following:  (A) "the nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1); (B) "the history and characteristics of the defendant," *id.*; (C) promotion of "respect for the law," 18 U.S.C. § 3553(a)(2)(A); (D) general and specific "deterrence," 18 U.S.C. § 3553(a)(2)(B)(C); (E) the Guidelines and Guideline range, § 3553(a)(4); and (F) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." § 3553(a)(6).

A.      *Nature and Circumstances of the Offenses*

The first factor this Court should consider is the nature and circumstances of the offense; both support a significant sentence for Darnel.  Marshall participated in a reproductive health clinic blockade involving numerous participants with the goal to prevent patients from obtaining, and providers from providing, abortion services.

Marshall's participation in the blockade was significant. Among other things, Marshall traveled with Harlow from Massachusetts, stopping along the way to pick up Bell and Goodman, to D.C. to block clinic access.  Marshall knew that the purpose of the Surgi-clinic blockade was to prevent the provision of pregnancy termination services, and refused to let clinic staff or clinic patients stop her from accomplishing that goal. Marshall pushed and shoved her way into the clinic, causing a clinic staff member Ms. Proctor to fall down. She rearranged the clinic's waiting area furniture to ensure it blocked all entrances to the treatment rooms, helped Bell and Harlow chain themselves together, and tied Hinshaw to a chair directly in front of the treatment area door.

When Ms. Jones entered the clinic, Marshall shouted at her, stood inches in front of her,

13

and demanded she change her appointment—despite Ms. Jones' desperate cries for Marshall to leave her alone. Marshall's actions forced Ms. Jones to climb through a reception area window to access the clinic's treatment area. Additionally, instead of helping Mrs. Holler to obtain the medical she needed to alleviate her obvious pain, Marshall stood over Mrs. Holler as she fell to the ground and pushed her when she tried to stand up. Rather than cooperating with law enforcement, Marshall used tactics she discussed at the pre-invasion meeting and delayed removal from the clinic.

A prison sentence at the high-end of Marshall's Guidelines range, which is 31-41 months, would account for Marshall's serious offenses. Her strongly held anti-abortion beliefs led her to travel to D.C. to participate in an organized clinic blockade. The blockade, which was broadcast to an on-line audience, encouraged others to commit similar crimes, publicized Marshall's own offense, and traumatized the victims. The blockade will have lasting impacts on the clinic's patients, including, Ms. Jones, Mrs. Holler, and the clinic staff, which they will likely struggle with life-long. For this reason, this factor supports a significant sentence.

B.      *The History and Characteristics of the Defendant*

Marshall acknowledged having strongly held anti-abortion views and participating in numerous rescues in the past. *See* 10/25/2023 Trial Tr. at 251:15-18. Marshall's actions on October 22, 2020, are a clear escalation—an escalation for which Marshall showed no remorse. As such, Marshall's history and characteristics support the imposition of a Guidelines sentence.

Marshall traveled from Massachusetts to Washington, D.C. to participate in the invasion, and entered the Surgi-clinic with one goal: prevent patients from exercising their reproductive health care rights. Marshall was aggressive in her pursuit of this goal and never wavered. When

Ms. Proctor blocked the clinic door to prevent Marshall from entering the clinic, Marshall pushed and shoved her out of the way. When Ms. Jones entered the waiting room, Marshall screamed at her and ignored her please. When Mrs. Holler arrived suffering labor pains, Marshall stood over her and pushed her down to prevent her from standing up and accessing the health care she needed right behind the door just feet away. Marshall refused to cooperate with law enforcement, delaying the clinic from providing reproductive health care even longer. While testifying at Harlow's trial, Marshall lied shamelessly in an attempt to minimize the criminal conduct of her sister, her other codefendants, and herself. Marshall showed no remorse for her actions and refused to acknowledge how her actions impacted the clinic staff and the clinic patients. Accordingly, a Guidelines sentence would appropriately address Marshall's escalating conduct and personal characteristics of using force to further her criminal objectives.

### C.   Promotion of Respect for the Law

Considering the gravity of the offenses, a significant sentence in this matter is necessary to reflect the seriousness of the offense and promote respect for the law. *See Gall*, 552 U.S. at 54 (recognizing that "a lenient sentence for a serious offense threatens to promote disrespect for the law"). A Guidelines sentence is appropriate in this case because Marshall was part of a large group that planned and blocked access to a reproductive health clinic in D.C. Marshall planned with others to "injure, oppress, threaten, and intimidate" the clinic's patients and providers from exercising their reproductive health rights free from violence and obstruction. *See* Superseding Indictment, ECF No. 113. As established at trial, Marshall understood that she had agreed with her co-conspirators to commit a crime, and that it was a violation of the FACE Act. She and her co-defendants were prepared to be arrested knowing the consequences of their actions. Marshall's

15

clinic blockade involved the use of force, which resulted in Ms. Compton suffering bodily injury and prevented Ms. Holler, who was suffering labor pains, from getting up off the floor and entering the clinic. The physical obstruction was especially traumatic for the clinic patients who testified at trial, which was apparent during the offense and their emotional trial testimony. *See*, *e.g.*, Exhibit No. 1011.

Marshall faced clear choices with regards to her activism: to engage in criminal conduct or engage in lawful protest. Marshall and her co-defendants' used force to take control of the Surgi-clinic and obstructed access to the facility. The trial evidence proved that Marshall appreciated the criminality of her conduct in committing a crime by blockading the clinic, and that despite knowing the consequences of her actions, she chose to violate federal laws. All of Marshall's choices, and her escalating conduct, point to the obvious need for a high-end Guidelines sentence that will promote respect for the law.

### D.    General and Specific Deterrence

Imposition of a significant sentence is necessary to provide for both general and specific deterrence. "Under the theory of general deterrence, the government essentially seeks to make an example of an offender through punishing him so that other potential offenders are intimidated into refraining from committing the contemplated crime." *United States v. Slatten*, 865 F.3d 767, 819 (D.C. Cir. 2017) (noting that "harsh sentences" "generally operate as strong deterrents"); *United States v. Diaz-Navarro*, 567 F. App'x 256, 257 (5th Cir. 2014) (since defendant had committed offense before and received a light sentence a "'long incarceration period'" was necessary for deterrence); *United States v. Rivera*, 488 F. App'x 225, 227 (9th Cir. 2012) (harsh sentence necessary for deterrence in light of defendant's recidivism).

First, a significant sentence is necessary "to afford adequate deterrence to criminal conduct" by others.  18 U.S.C. 3553(a)(2)(B).  Sentencing Marshall to a period of incarceration would deter other abortion extremists (whether pro-life or pro-choice) from obstructing access to reproductive health services.   The general deterrent effect would be significant because the instant case has been widely followed by anti-abortion extremists, and a high-end Guidelines sentence would broadcast a strong message to other would-be criminal actors.

Second, a significant sentence is also necessary for specific deterrence.  In light of Marshall's strongly held beliefs, and willingness to escalate her actions to prevent access to reproductive healthcare, a prison sentence particularly at her current age, will prevent her from engaging in future violations of federal law.

Without imposition of a significant Guidelines sentence here, Marshall and other would-be violators will not be discouraged from engaging in misconduct and may believe that there are relatively minimal consequences for flagrantly committing crimes that target the provision of reproductive health care.

E.       *The Sentencing Guidelines*

Examination of the Section 3553(a) factors shows that a high-end Guidelines sentence is appropriate in this case.  While a "sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply," *Rita v. United States*, 551 U.S. 338, 351(2007), and it "may not presume that the Guidelines range is reasonable," *Gall*, 552 U.S. at 50; *Nelson v. United States*, 555 U.S. 350, 350 (2009), "even in an advisory capacity the Guidelines serve as 'a meaningful benchmark' in the initial determination of a sentence and 'through the process of appellate review.'"  *Rosales-Mireles*, 585 U.S. at 133.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita*, 551 U.S. at 349.  As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m).  In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108.  As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. § 1A1.1, intro, comment 3.  More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process.  *See* 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines).  Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case.  Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005).

In light of Marshall's conduct in this case, a Guidelines sentence would be reasonable and appropriate for both counts of conviction.  A guidelines sentence in this case would be 31 to 41 months—a significantly less amount of time than the maximum allowable sentence for her counts of conviction (Count One statutory maximum sentence of 10 years; Count Two statutory maximum sentence of 12 months).  Such a sentence would be reasonable because it appropriately accounts

for her conduct in the Surgi-clinic blockade—her use of force, her aggressive confrontations with clinic staff and patients, and her actions that ensured the removal of her codefendants would take as long as possible. And, it would be sufficient, but not greater than necessary, to comply with the basic aims of Section 3553(a). *Rita*, 551 U.S. at 348.

F.      *Unwarranted Sentencing Disparities*

This Court should impose a guidelines sentence to avoid any unwarranted sentencing disparity. 18 U.S.C. § 3553(a)(6); *see, e.g.*, *Molina-Martinez v. United States*, 578 U.S. 189, 193 (2016) ("Uniformity and proportionality in sentencing are achieved, in part, by the Guidelines' significant role in sentencing"); *United States v. Alford*, 89 F.4th 943, 953 (D.C. Cir. 2024) ("Thus, '[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly.'"); *United States v. Otunyo*, 63 F.4th 948, 960 (D.C. Cir. 2024) (same).

Although Marshall and her co-defendants in this case, along with defendants from one other recently charged unrelated case from the Middle District of Tennessee (*see United States v. Gallagher*, et al., 22-cr-327 (M.D.TN)), will be the first groups of defendants sentenced for conspiring to violate reproductive health rights, they all are similarly situated to other Section 241 convicted defendants who received Guidelines sentences where the objects of their civil rights conspiracy targeted other federally protected rights. *See*, *e.g.*, *United States v. Liddy*, 542 F.2d 76, 78 (D.C. Cir. 1976) (Defendant convicted of violating Section 241 (Fourth Amendment right at issue) sentenced to a term of imprisonment from one to three years); *United States v. Stewart*, 65 F.3d 918, 931-32 (11th Cir. 1995) (Court imposition of a Guidelines sentence in a Section 241 prosecution affirmed (42 U.S.C. § 3631 housing rights at issue)); *United States v. Whitney*, 229

F.3d 1296, 1309 (10th Cir. 2000) (same); *United States v. Allen*, 341 F.3d 870, 897 (9th Cir. 2003) (affirming Guidelines sentence for Section 241 conviction with right at issue was denial of public accommodations because of race); *United States v. McCoy*, 480 F.App'x 366, 373 (6th Cir. 2012) (Guidelines and statutory maximum sentence imposition affirmed for convictions of Sections 241 and 242).   Therefore, a Guidelines sentence for Marshall would not result in any sentencing disparities.

The government also strongly opposes any requested variance from the Sentencing Guidelines.   Marshall's conduct showed a flagrant disregard for women's reproductive health rights, and the lack of concern for patients Ms. Jones and Mrs. Holler who, for example, sought care during a particularly sensitive time in their lives.   Combined with the other sentencing factors, a high-end Guidelines sentence would serve all of the Section 3553(a) factors.

## IX.    Requested Sentence

The government recommends that the Court impose a sentence at the high-end of Marshall's Guidelines Sentencing range, which is 31-41 months.   The advisory Guidelines Sentencing range should be given considerable weight.   First, the Guidelines range is itself a § 3553(a) factor.   "The fact that § 3553(a)[(4)] explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process."   *Gall*, 552 U.S. at 50, n.6. Second, one of the Sentencing Commission's purposes in promulgating the Guidelines was to "assure the meeting of the purposes of sentencing as set forth in section 3553(a)(2)."   28 U.S.C. §§ 991(b)(1)(A), 994(f).   The Commission wrote the Guidelines to "carry out these same § 3553(a) objectives," resulting in "a set of Guidelines that seek to embody the § 3553(a) considerations,

20

both in principle and in practice." *Rita*, 551 U.S. 338, 350.  "[W]here judge and Commission both determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that significantly increases the likelihood that the sentence is a reasonable one."  *Rita*, 551 U.S. at 347.  In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.[5]

Marshall was a key participant in the instant offense. Marshall not only capitalized on her victimization of vulnerable victims, she and her co-defendants promoted and publicized her crimes.  Marshall also committed perjury and has not demonstrated any willingness to find lawful ways to advance her beliefs.  Here, a sentence at the high-end of the Guidelines will achieve a sentence that reflects the Sec. 3553 factors.  In particular, such a sentence reflects the gravity of the offense (to include vindicating the rights of those whom Marshall victimized), the need for deterrence, and the absence of any mitigating factors.

//

//

//

---

[5]      The government respectfully disagrees with Probation's recommendation for a downward variance.  ECF No. 520.  Their recommendation is based on the following: (1) the nature of the circumstances of the offense, and (2) to avoid unwarranted sentence disparities.  *Id.* at 3.  As set forth above, the government believes that the nature and circumstances of the offenses – attempting to deny the receipt of reproductive health care and intentionally inflicting physical and mental pain on patients – merits a Guidelines sentence; and, as the D.C. Circuit has held, imposing a Guidelines sentence is the best way to avoid unwarranted sentencing disparities.

Respectfully submitted,


MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052
*/s/ Rebecca G. Ross*
REBECCA G. ROSS
NY Bar No. 5590666
JOHN CRABB JR.
NY Bar No. 2367670
Assistant United States Attorneys
601 D Street, NW
Washington, DC 20001
john.d.crabb@usdoj.gov

KRISTEN CLARKE
ASSISTANT ATTORNEY GENERAL
CIVIL RIGHTS DIVISION
*/s/ Sanjay H. Patel*
SANJAY H. PATEL
IL Bar. No. 6272840
Trial Attorney
Criminal Section, Civil Rights Division
Email: Sanjay.Patel@usdoj.gov

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of this memorandum has been filed and served upon all parties listed on the Electronic Case Filing (ECF) System and is available for viewing and downloading from the ECF system.


<u>*/s/ Rebecca G. Ross*</u>
REBECCA G. ROSS
Assistant United States Attorney